PROPERTY RIGHTS LAW OF HAWAI'I, INC.
Robert Stone, Attorney No. 9920
7 Waterfront Plaza
500 Ala Moana Blvd., Suite 400
Honolulu, HI 96813
tel:  (808) 543-8332
e-mail:  rlstone@propertyrightslawgrp.com
Attorney for Plaintiff Arsenio Aguilar Pascua

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| ARSENIO AGUILAR PASCUA, | ) |
| | ) Case No._____ |
| Plaintiff, | ) (FDCPA, Slander of Title, |
| v. | ) and Quiet Title) |
| | ) |
| OPTION ONE MORTGAGE CORPORA- | ) COMPLAINT; |
| TION; HOMEWARD RESIDENTIAL, INC.; | ) JURY DEMAND; |
| WELLS FARGO BANK, N.A.; and OCWEN | ) EXHIBITS "A" - "S;" and |
| LOAN SERVICING, LLC; | ) VERIFICATION |
| | ) |
| Defendants. | ) |

## COMPLAINT

COMES NOW the Plaintiff, Arsenio Aguilar Pascua ("Mr. Pascua"), by his

attorneys, Property Rights Law Group of Hawaii, Inc., and hereby files this

Complaint and alleges in support thereof as follows:

## NATURE OF THE CASE

1.     On July 31, 2007, Mr. Pascua signed a promissory Note and granted a

Mortgage to Defendant Option One, the original mortgagee.  In 2008, Defendant

Homeward Residential ("Homeward") claimed to have purchased the Note but

- 1 -

could provide no proof of purchase.  On July 27, 2012, Pite Duncan, LLC, a law firm doing business in California and representing Defendant Wells Fargo, sent Mr. Pascua a Notice of Default stating Wells Fargo's intent to foreclose upon the subject property.  On February 7, 2013, Defendant Homeward sent Mr. Pascua an alleged "Assignment of Mortgage," to prove to Mr. Pascua that Homeward purchased the Mortgage from Option One.  However, the purported "Assignment of Mortgage," pre-executed and pre-notarized in 2007, does not list an assignee-- there is simply a blank space where the assignee's name should be. As such, Defendant Homeward's own documents suggest that it never acquired Mr. Pascua's Note or Mortgage from Option One.  On March 1, 2013, Homeward sold whatever interest it has to Ocwen.  Upon information and belief, none of the Defendants owns Mr. Pascua's Note and Mortgage.  For them to claim they do is an unfair debt-collection practice.

2.     Upon information and belief, Defendants Homeward, Wells Fargo, and Ocwen have sent false information to Mr. Pascua for the purpose of collecting a debt owed to another.  Moreover, all Defendants are claiming adversely to own Mr. Pascua's mortgage debt, which constitutes a cloud on Mr. Pascua's title.  After diligent research and communication, Mr. Pascua is unable to ascertain the true owner of his debt or the true servicer of his debt.

3.     Multiple entities claim to own Mr. Pascua's mortgage and/or are

threatening foreclosure. Mr. Pascua asks this Court to declare which of the entities is the owner of the Mortgage.

## JURISDICTION AND VENUE

4.     In Count I, Plaintiff alleges that Defendants Homeward, Wells Fargo, and Ocwen have posed deceptively as the mortgagee of the Subject Property, in violation of the United States Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, *et seq*. ("FDCPA"). This Court under 28 U.S.C. § 1331, has original jurisdiction of all actions arising under the laws of the United States. In this count, Mr. Pascua seeks statutory damages of $1,000, plus actual damages of $430,300 (the estimated value of the Subject Property), plus punitive damages.

5.     All counts arise from a common nucleus of operative facts such that a plaintiff would ordinarily be expected to try all counts in one judicial proceeding. Alternatively, the diversity-of-citizenship jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties, and the matter in controversy exceeds the sum or value of $75,000. In all Counts, the damages are equal to the value of the property, which is roughly $433,300.00. Alternatively, the damages are equal to the loss of equity in Mr. Pascua's property, which is roughly the same amount.

6.     In the prayers for relief, Plaintiff asks for statutory damages, plus

actual damages in an amount to be determined at trial (estimated at $433,300.00, the value of Subject Property), plus reasonable attorneys' fees and costs, plus injunctive relief under this Court's equity jurisdiction and pursuant to 28 U.S.C. § 2201, plus a declaratory judgment pursuant to Fed. R. Civ. P. 57.

7.     The Court has personal jurisdiction over all parties.  At all times hereinafter mentioned, Mr. Pascua was and still is domiciled in Honolulu County, Hawaiʻi.  The Defendants have their headquarters and principal places of business outside the State of Hawaiʻi, but the Defendants do business extensively in Hawaiʻi, have availed themselves of the courts of Hawaiʻi, and have committed acts in Hawaiʻi that are the subject of this lawsuit.

8.     Venue is proper pursuant to 28 U.S.C. § 1391, because the Subject Property is real estate situated in Honolulu County, Hawaiʻi.

## THE PARTIES

9.     Plaintiff, Mr. Pascua, at all times relevant hereto has been a resident of the County of Honolulu, State of Hawaiʻi.  Mr. Pascua is the rightful owner of the real property located at 84-296 Ikuone Place, Waianae, Hawaiʻi 96792, Tax Map Key No. (1) 8-4-024-045-0000 (the "Subject Property").

10.     Defendant Option One Mortgage Corporation ("Option One"), now known as Sand Canyon Corporation, is a wholly-owned subsidy of H&R Block Inc.  Option One is a corporation that is incorporated in the state of California and

it has a principal place of doing business in Irvine, California.  Defendant Option One has been doing business in the State of Hawai'i at all times relevant herein.

11.    Defendant Homeward Residential, Inc. ("Homeward Residential"), formerly known as American Home Mortgage Servicing, Inc., is a corporation that is incorporated in the state of Delaware and it has a principal place of doing business in Coppell, Texas.  Defendant Homeward Residential has been doing business in the State of Hawai'i at all times relevant herein.

12.    Defendant Wells Fargo Bank, N.A., ("Wells Fargo") is a national banking association chartered under the laws of the United States, with its principal place of business in Sioux Falls, South Dakota.  Defendant Wells Fargo has been doing business in the State of Hawai'i at all times relevant herein.

13.    Defendant Ocwen Loan Servicing, LLC ("Ocwen"), is a limited-liability Company incorporated in the state of Delaware and having its principal place of doing business in West Palm Beach, Florida.  Defendant Ocwen has been doing business in the State of Hawai'i at all times relevant herein.

## LIST OF EXHIBITS

14.    This Complaint includes the following Exhibits, organized alphabetically, as they are presented and discussed:

A.    The Certificate of Title and Lot Book Report for the Subject Property;

B.    A copy of the promissory Note without allonge, executed on

7/31/2007, and sent to Plaintiff by Homeward on 2/7/2013;

C.    The Mortgage, executed on 7/31/2007;

D.    A Letter sent by American Home Mortgage Servicing on 5/11/12, informing Mr. Pascua of its change of name to Homeward;

E.    A Declaration of Dale M. Sugimoto, President of Sand Canyon Corporation, dated 3/18/2009, and attesting to business practices of Option One;

F.    A Letter Sent by Homeward to Plaintiff, dated 5/29/2012;

G.    A Letter Sent by Homeward to Plaintiff dated 2/7/2013;

H.    A Notice of Default sent by Pite Duncan, LLC, to Plaintiff, dated 7/27/2012;

I.    A Letter sent by Homeward to Mr. Pascua dated 8/29/2012;

J.    A certified photocopy of the promissory Note, with an unaffixed allonge, sent to Plaintiff by Homeward on 8/29/2012;

K.    The purported "Assignment of Mortgage," sent by Homeward to Mr. Pascua on 8/29/2012;

L.    A Letter sent to Mr. Pascua by Homeward dated 2/13/2013;

M.    Written Testimony of Adam J. Levitin, Associate Professor of Law, Georgetown University Law Center, Before the Senate Committee on Banking, Housing, and Urban Affairs, dated 11/16/10;

N.    Commonwealth of Massachusetts Press Release dated 8/9/2011, and describing Option One's settlement with the state;

O.    Option One's Settlement with Massachusetts "FAQs," published by the state;

P.    SEC's Litigation Release No. 22344, published 4/24/2012, alleging fraud by Option One;

Q.    Office of the Inspector General of the Department of Housing and Urban Development's "Memorandum of Review," criticizing Wells Fargo's foreclosure practices, dated 3/12/2012;

R.    Wells Fargo's Consent Judgment with the Justice Department, the Department of Housing and Urban Development, and 49 state attorneys general;

S.    Letter dated 2/8/2013 stating Homeward is a debt collector;

### FACTS COMMON TO ALL COUNTS

15.    Mr. Pascua owns and possesses the Subject Property, with a transfer Certificate of Title Number 464,392.  No other party is in possession.  (A complete, true, and correct copy of Mr. Pascua's Certificate of Title No. 464,392 is attached hereto as Exhibit "A.")

16.    On July 31, 2007, Mr. Pascua executed a promissory Note to the order of Defendant Option One, the original mortgagee.   (A complete and correct photocopy of the Note, provided to Mr. Pascua by Defendant Homeward on February 7, 2013, and bearing no endorsement or allonge, is attached hereto as Exhibit "B.")

17.    Also on July 31, 2007, to secure this loan, Mr. Pascua signed a Mortgage that conveyed a security interest in the Subject Property to Option One as lender.  (A complete, true, and correct copy of the Mortgage, as it was recorded

on August 6, 2007, is attached hereto as Exhibit "C.")

18.    On April 30, 2008, H&R Block, Inc., (the parent company of Option One) sold Option One to American Home Mortgage Servicing, Inc. (n/k/a Defendant Homeward[1]).  It is unknown whether Mr. Pascua's loan or Mr. Pascua's servicing rights were among the sale. (*See* the "Declaration of Dale M. Sugimoto, as President of Sand Canyon Corporation," filed in the Bankruptcy Petition of Ron and La-Rhonda Wilson, Case No.: 07-11862, ECF No. 141, a complete, true, and correct copy of which is attached hereto as Exhibit "E.")

19.  Pursuant to the sale agreement, Option One changed its name to "Sand Canyon Corporation." Sand Canyon Corporation purportedly no longer engages in the servicing of residential mortgage loans, nor does Sand Canyon Corporation own any residential real estate mortgages.  (*See* Exhibit "E.")

20.    However, Homeward's own records contradict one another.   The records list different dates of its purported acquisition of servicing rights.  In one letter sent to Mr. Pascua, Defendant Homeward states that it purchased the servicing right on April 30, 2008; in another letter sent to Mr. Pascua, Defendant Homeward states that servicing rights were purchased on July 1, 2008.  This is the

---

[1] American Home Mortgage Servicing, Inc., changed its name to Homeward Residential on May 29, 2012.  To avoid confusion, Mr. Pascua refers to the actions of this Defendant, both before and after its name change, as simply "Homeward." (A complete, true, and correct copy of a letter dated May 11, 2012, informing Mr. Pascua of the name change is attached hereto as Exhibit "D.")

first of several instances where Homeward contradicts itself regarding its alleged interest in Mr. Pascua's loan.  (A complete, true, and correct copy of a Letter sent by Homeward on May 29, 2012, to Mr. Pascua, and stating "servicing rights were acquired on April 30, 2008," is attached hereto as Exhibit "F."  Compare this date with July 1, 2008, as listed in a subsequent Letter sent by Homeward on February 7, 2013, a complete, true, and correct copy of which is attached hereto as Exhibit "G.")

21.    In Exhibit "F," the Homeward Letter dated May 29, 2012, states:

> The owner and holder for the above-referenced account is Wells Fargo Bank, N.A., as Trustee for Soundview Home Loan Trust 2007-OPT5, Asset-Backed Certificates, Series 2007-OPT5.  Homeward Residential is the current servicer of the account and collects payments on behalf of the owner.

However, later in the letter, on Page 3, it states:

> . . . if the Note Holder (Homeward) has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, . . .

Thus, Defendant Homeward states that Wells Fargo is the holder (owner) of the Note, but later in the same Letter, it states that Homeward itself is the holder of the Note. (*See* Exhibit "F.")  However, since there is only one instrument to possess, there can only be one holder.  [*See* HRS § 490:1-201(b): "'Holder,' means: (1) The person in possession of a negotiable instrument . . . ."]

22.    Not surprisingly, in the Letter dated May 29, 2012, Defendant

Homeward refused to show Mr. Pascua any proof of possession of the Note:

> The instrument . . . is in our possession or held on our behalf by our custodian.
>
> The original executed documents must remain with the current servicer . . . .

(*See* Exhibit "F.")

23.    Confusingly, this language also seems to suggest that Defendant Homeward does not service the loan, since it does not refer to itself as "the current servicer." (*See* Exhibit "F.") Thus, it is an open question whether Homeward has either an ownership interest in the loan or a servicing interest in the loan.

24.    On July 27, 2012, Pite Duncan, LLP, in San Diego, California, on behalf of Wells Fargo as Trustee for Trust 2007-OPT5, sent Mr. Pascua a "Notice of Default" that stated that Wells Fargo is the creditor "to whom the debt is owed." The Notice of Default threatened an acceleration of all sums due on the Note and threatened a foreclosure on the Subject Property. (A complete, true, and correct copy of the Notice of Default is attached hereto as Exhibit "H.")

25.    The Notice of Default demands that any payment be made in "certified funds, cashier's check or money order(s) payable to and mailed to" Homeward. However, the mailing address listed is Pite Duncan's offices in San Diego, California, and the creditor to whom the debt is owed is "Wells Fargo."

26.    Before Mr. Pascua sends a certified check for nearly a half of a

million dollars, Mr. Pascua demands to know exactly which entity is the holder of the debt and which entity the servicer of the debt--at the very least, there is confusion among all of the parties as to the rights of each party.  If Mr. Pascua issues a certified check or money order to the wrong party, the consequences would be disastrous--not only would Mr. Pascua's money be lost, but also the wrong entity would be unjustly enriched.

27.    On August 29, 2012, Homeward sent Mr. Pascua a Letter stating that Homeward was merely the servicer of the loan, but then perplexingly attached a copy of the Note with an unaffixed "allonge." (An allonge is "[a] piece of paper annexed to a negotiable instrument or promissory note, on which to write endorsements for which there is no room on the instrument itself.  Such must be so firmly affixed thereto as to become a part thereof."  *See Black's Law Dictionary,* s.v. "Allonge" (6th ed.).   A complete, true, and correct copy of the Letter dated August 29, 2012, is attached hereto as Exhibit "I."  A complete and true copy of the Note with the unaffixed "allonge" is attached hereto as Exhibit "J."

28. The unaffixed "allonge" bears an endorsement in blank, which Homeward says makes it not only the servicer, but also the holder and owner of indebtedness.

29.    However, the "allonge" is insufficient to negotiate the instrument under Article 3 of the Hawaii Uniform Commercial Code (*See* HRS § 490:3-101 *et*

*seq.*).  The last page of the Note (Page 3 of 3) clearly has enough space that would allow for the small stamped endorsement.  In fact, there are no other endorsements on the Note--the endorser had a third of an entire page to make an endorsement, but failed to do so.  (*See* Page 3 of Exhibit "J," where an endorsement should be.)

30.    Moreover, there is no evidence of staple holes, paper clip indentations, tape outlines, or glue markings on the purported allonge indicating that it was ever "affixed to the instrument." (*See* Exhibit "J.")  This is fatal to the negotiation of the Note through the "allonge.'  In fact, the "allonge" is evidence that Homeward was never in possession of the Note.  Otherwise the endorsement would be properly executed on the Note itself.

31.    In the alternative, the Note is not a negotiable instrument. While the Note evidences a promise to pay money, it does not pass the threshold test of negotiability presented in Article 3 of the UCC.  Specifically, HRS § 490:3-104, defines a negotiable instrument as:

> . . . an <u>unconditional</u> promise or order to pay a <u>fixed amount of money</u> . . .  [which] <u>does not state any other undertaking or instruction</u> by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain: (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of any obligor. [emphasis added]

> [Furthermore, under HRS § 490:3-106] a promise or
> order is unconditional unless it states . . . that the promise
> or order is <u>subject to or governed by another writing</u>.
> [emphasis added]

Only a promissory note that meets this strict definition is "negotiable" under Article 3 of the UCC; a promissory note that does not meet this definition is still a binding contract, but it cannot be transferred by mere negotiation.  As classically stated by Chief Justice Gibson of the Supreme Court of Pennsylvania: "a negotiable bill or note is a courier without luggage.  It is a requisite that it be framed in the fewest possible words, and those imposing the most certain and precise contract . . . ."  *Overton v. Tyler*, 3 Pa. 346, 347 (1846) (holding an instrument containing contingencies and conditions was not a negotiable instrument).  The three-page Note with two separate addendums, contains eleven different provisions with multiple paragraphs in each.  This is a far cry from an instrument "framed in the fewest possible words" that both the *Overton* Court and the U.C.C. contemplated.  (Compare the length and complexity of Exhibit "B," the Note, with a simple draft from a standard checkbook--the classic example of a negotiable instrument.)

32.    First, the Note contains several costs and expenses, which are not for a "fixed amount of money."

a.    Paragraph 7(D), "Payment of Note Holder's Costs and Expenses" states:

> If the Note Holder has required me to pay
> immediately in full as described above, the Note
> Holder will have the right to be paid back by me
> for all of its costs and expenses in enforcing this
> Note to the extent not prohibited by applicable
> law, <u>whether or not a lawsuit is filed.  Those</u>
> <u>expenses include, for example, reasonable</u>
> <u>attorneys' fees</u>.  [emphasis added]

Thus, the Note Holder is entitled to an uncertain amount of money.

Reasonable attorney's fees are uncertain sums to be paid.  Plus, the

clause "for example" suggests there are other costs and expenses not

even listed.  These uncertain amounts could add up to more than the

principal itself.  The Note Holder is further entitled to this uncertain

amount of money whether or not it is the result of a legal proceeding.

(*See* Exhibit "B," the Note.)

b.     Paragraph 6, "Loan Charges," contains a usury-savings clause.

This clause attempts to negate interest payable that may otherwise

result in more than the law permits.  It states:

> If a law, which applies to this loan and which sets
> maximum loan charges, is finally interpreted so
> that the interest or other loan charges collected or
> to be collected in connection with this loan exceed
> the permitted limits, then: (i) any such loan charge
> shall be reduced by the amount necessary to reduce
> the charge to the permitted limit; and (ii) any sums
> already collected from me that exceeded permitted
> limits will be refunded to me.  The Note Holder
> may choose to make this refund by reducing the

> principal I owe under this Note or by making a
> direct payment to me. If a refund reduces
> Principal, the reduction will be treated as a partial
> prepayment.

This usury-savings clause destroys negotiability because it makes the Note

for an uncertain amount of money.  (*See* Exhibit "B," the Note.)

33.    Second, the Note fails to "not state any other undertaking or

instruction."  Paragraphs 5 and 8 include undertakings in addition to the payment

of money, which are not permitted by the UCC.

> a.    Paragraph 5, "Borrower's Right to Prepay," contains a
> prepayment clause that requires written notice:

>> When I make a Prepayment, I will tell the Note
>> Holder in writing that I am doing so.

> While prepayment alone does not make the Note conditional, the
> undertaking of providing written notice is "in addition to the payment
> of money."  (*See* Exhibit "B," the Note.)

> b.    Paragraph 8, "Giving of Notices," mandates any notice from the
> Borrower be delivered in writing:

>> Any notice that must be given to the Note Holder
>> under this Note will be given by mailing it by first
>> class mail to the Note Holder at the address stated
>> in Section 3(A) above or at a different address if I
>> am given a notice of that different address.

This clause also falls outside the U.C.C.'s strict definition of negotiable. (*See*

Exhibit "B," the Note.)

34.    Finally, the Note is non-negotiable because it "is subject to or governed by another writing" with respect to condition not among the three permissible exceptions listed in § 490:3-106.   Paragraph 11 of the Note states:

> In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.

In other words, the Note cannot be understood without reference to an external document and therefore is "subject to or governed by another writing."   (*See* Exhibit "B," the Note.)   And § 490:3-106 requires that such references may be only "with respect to collateral, prepayment, or acceleration."   But in Pascua's Note, the "undertakings and instructions" go beyond the three permissible references:

a.    Some of these incorporated undertakings and instructions include, but are not limited to: undertakings by the borrower to buy insurance, instructions about escrow procedure, instructions about RESPA, instructions about the Federal Home Loan Bank, instructions about refunds, undertakings to pay all taxes attributable to the Property, instructions about encroaching liens, instructions about the Federal Emergency Management Agency, undertakings to assign insurance benefits, undertakings by borrower to give

various notices, undertakings about responding to notices, undertakings concerning occupancy, undertakings with regard to arranging inspections, undertakings in case of a taking of the property by a third party, undertakings about how to change the Security Instrument, instructions about co-signers, instructions about severability and rules of construction, undertakings about how to transfer the property, instructions about borrower's right to reinstate after acceleration, instructions about changes in loan servicers, undertakings about how to give notice of grievance, and undertakings about how to dispose of waste.   (*See* Exhibit "C," the Mortgage.)

b.      Moreover, by including the word "Some" in the Note, the Lender also reserves other unlisted conditions.  Thus the Note is "subject to or governed by another writing," which may not have even existed at the time the Note was executed.  (*See* Exhibit "B," the Note.)

35.     In short, the Note carries with it, a large amount of "luggage."  The presence of any one of the above provisions found in the Note--the additional costs and expenses "not for a fixed amount of money," the additional "undertaking or instruction . . . in addition to the payment of money," or the fact that the Note is "subject to or governed by another writing" that goes beyond the three permitted exceptions--means the Note does not meet the strict definition of "negotiable," is

- 17 -

not governed by Article 3 of the U.C.C., and thus cannot be transferred by endorsement.  A mere endorsement would convey no interest to the "holder" or "bearer" of the Note.

36.    The Note therefore is transferable not under Article III of the U.C.C. but rather under Article IX of the U.C.C. or under the common law of contracts, both of which require a complete chain of title and consideration, neither of which is present. In essence, Homeward or Wells Fargo or Ocwen is holding nothing more than a photocopy of a (assignable but not assigned) contract between Option One and Mr. Pascua.

37.     Five months later, on February 7, 2013, Homeward sent Mr. Pascua yet another letter, this time stating:

> The owner and holder . . . is Wells Fargo [as Trustee of
> Trust 2006-OPT5].  Homeward Residential is the current
> servicer of the account
> . . . .

(See Exhibit "G," the last page of Letter from Homeward dated February 7, 2013, and indicating attachments.)

38.    In the Letter dated February 7, 2013, Homeward enclosed a number of attachments.  These attachments purportedly establish that Wells Fargo purchased the Note and Mortgage.  In fact, these attachments suggest the opposite--they do not suggest any transfer occurred at all.  The first attachment of significance is a purported "Assignment of Mortgage."  (A complete, true, and correct copy of the

purported "Assignment of Mortgage" is attached hereto as Exhibit "K.")

39.    On its face, the purported "Assignment of Mortgage" conveys nothing to Wells Fargo.  In the assignment, Option One, the assignor, allegedly:

> does hereby without recourse sell, assign, transfer and set over unto Assignee, its successors and assigns, all of its rights titles and interest in [Mr. Pascua's mortgage loan].

(*See* Exhibit "K.")

40.    This purported assignment could not convey a Note, even if there were an assignee.  No assignee is listed in the purported "Assignment"--there is simply a blank space to be filled in after the execution of the document.  (See Exhibit "K," the blank space where an assignee's name is to be entered.)

41.    This purported "Assignment" was pre-executed by "Alex Delgado, Records Management" of Option One (one might wonder how well the records are in fact managed under Mr. Delgado).  This disturbing fact is compounded by the "pre-notarization" performed by "Arleen J. L. Diamsay," in Orange County, California.

42.    This purported "Assignment" can mean only one of two things.  Either:

> (1)    It was fraudulently pre-executed and fraudulently pre-notarized by Option One, intending it to be an altered (and thus fraudulent) certified document.  (*See* HRS § 456-1.6, "Alter" [in notarized

documents] means . . . insertion of new content.)

(2)     It was fraudulently created by Homeward in order to pass title either to itself or to Wells Fargo.

Either scenario conveys absolutely nothing to Wells Fargo, and either scenario further calls into question the business practices of Defendants. Quite simply, if Wells Fargo is going to claim it is an assignee of a mortgage, it must be listed as an assignee of the mortgage.

43.     Furthermore, the purported "Assignment" is not recorded on the Subject Property.  If Wells Fargo did own a Note worth nearly a half of a million dollars secured by a property worth at least that much, it would have recorded its alleged interest in order to put the public on constructive notice of its claim.

44.     The fact that Homeward even possesses a notarized purported "Assignment of Mortgage" with a blank space for the assignee calls the authenticity of the document into question.  The dubious pre-notarization of the document, the blank line, and the lack of recording, all add up to one thing: this is a forged document created out of thin air to manufacture an interest in Mr. Pascua's property.  The alleged "Assignment" is thus void *ab initio*.

45.     The second disturbing attachment that Option One sent to Mr. Pascua is a purported copy of the Note, this time without the unattached "allonge."  (*See* Exhibit "B," the Note as attached to the February 7, 2013, Letter.)

46.     The simple fact that there was an "allonge," and then there was not an allonge, at the very least means that the "allonge" is not affixed to the Note as required by statute (assuming *arguendo* the Note is, in fact, negotiable).  *See* HRS § 490:3-204: **"**For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument [an allonge] is a part of the instrument." *See also Tovar v. Heritage Pac. Fin., LLC (In re Tovar)*, 2012 Bankr. LEXIS 3633 (B.A.P. 9th Cir. 2012) (examining the physical attributes of an allonge to determine if it was "affixed," and thus a valid negotiation).

47.     As the entity attempting to enforce the instrument, it is Wells Fargo's burden to prove not only that the "allonge" is affixed (which it is not), but also that: (1) Wells Fargo is entitled to enforce the instrument (*i.e.* it is a holder in possession), and (2) all signatures are valid.  (*See* HRS § 490:3-301 and 3-308, providing the elements of a *prima facie* case to enforce a negotiable instrument.)

48.     Mr. Pascua specifically denies that Wells Fargo is entitled to enforce the instrument, because Homeward claims that it is the holder of the instrument, and Homeward purportedly possesses the instrument.  However, since the unaffixed "allonge" is entirely ineffective, the Note actually might belong to Option One, since it is made to the order of Option One. Furthermore, Mr. Pascua denies the authenticity of the endorsement.  Due to the suspicious nature of the unattached "allonge," under Article III of the U.C.C., it is Wells Fargo's burden to

establish the validity of the endorsement and it is Wells Fargo's burden to establish that the "allonge" is affixed to the instrument.

49.    First, to be a "holder," Wells Fargo must actually possess the instrument.  The Note is like a draft from a checkbook; a mere photocopy of a Note cannot be enforced against the maker, just as a photocopy of a check cannot be cashed against the drafter.  (While the U.C.C. allows for some exceptions, none apply here).  A party that relies on a purported "allonge" must produce the original "wet-ink" Note, with affixed allonge, to prove it is in possession of the instrument and thus entitled to enforce it.

50.   Second, the suspicious way the "allonge" appears and then disappears casts serious doubt on its authenticity.

51.    Finally, upon information and belief, Tracy Lang, "Assistant Secretary" of Option One Mortgage Corporation, does not have the authority to negotiate an instrument on behalf of Option One.  It is questionable whether an "Assistant Secretary" at Option One has the ability to sign a paycheck, let alone a Note worth nearly a half of a million dollars.  There is no corporate filing, incumbency certificate, or any evidence to suggest that Tracy Lang has the authority to sell or transfer such a substantial asset, especially in light of the dubious nature of the endorsement.  Furthermore, after a diligent search, there is no evidence of a Tracy Lang ever having worked for Option One or Sand Canyon.

Mr. Pascua puts Wells Fargo to its burden of proof, and until Wells Fargo can meet its burden, Wells Fargo cannot assert an interest in the Note.

52.  If Defendant Wells Fargo is allowed to claim ownership of the Note, then the consequences would be inequitable to multiple parties. The unknown good-faith purchaser of Mr. Pascua's Note (the Holder in Due Course) still has a legal right to enforce the Note as a personal debt, long after Wells Fargo forecloses on the Subject Property--leaving Mr. Pascua in a type of "double jeopardy" and leaving the Holder with a loss of a half of a million dollars.

53.    The purported "Assignment of Mortgage" and the purported transfer of Note also are without consideration.  There is absolutely no documentation of purchase: no receipt, no paper trail, no evidence whatsoever that the purchase of such a substantial asset ever occurred.  Today, the purchase of a simple cup of coffee nearly always generates a receipt; it is unbelievable that Wells Fargo cannot produce any proof of ownership whatsoever for a half-million dollar asset.  Yet that is exactly what Defendants Homeward, Wells Fargo, and Ocwen are asking Mr. Pascua, and this Court, to believe.

54.    On February 13, 2013, Defendant Homeward sent Mr. Pascua a Letter, which stated:

> Effective 03/01/2013, Homeward Residential, Inc. (Homeward Residential) will transfer the servicing of your account to Ocwen Loan Servicing, LLC (Ocwen).

Thus, Homeward is attempting to further profit by attempting to sell assets it does not own to another entity.  (A complete, true, and correct copy of the Letter dated February 13, 2013, is attached hereto as Exhibit "L.")

<u>RELATED CASES AND MATERIALS</u>

55.    On November 16 and 18, 2010, Professor Adam J. Levitin, Professor of Law at Harvard University, an authority on mortgages and securitization, testified before the Senate Committee on Banking, Housing, and Urban Affairs, and before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity:

> Professor Kurt Eggert has noted a variety of abusive servicing practices, including 'improper foreclosures or attempted foreclosures; imposition of improper fees, especially late fees; forced-placed insurance that is not required or called for; and misuse of escrow funds.' Servicers' ability to retain foreclosure-related fees has even led them to attempt to foreclose on properties when the homeowners are current on the mortgage . . . .
>
> There is also growing evidence of servicers requesting payment for services not performed or for which there was no contractual right to payment.
>
> Perhaps the most disturbing problem that has appeared in foreclosure cases is evidence of counterfeit or altered documents and false notarizations.   To give some examples, there are cases in which multiple copies of the "true original note" are filed in the same case, with variations in the True original note;" signatures . . . that have clearly been affixed        to        documents        via Photoshop; "blue ink" notarizations that appear in blank ink . . . .

- 24 -

> Most worrisome is evidence that these frauds might not
> be one-off problems, but an integral part of the
> foreclosure business . . . .  While the fraud in these cases
> is not always by servicers themselves, but sometimes by
> servicer support firms or attorneys, its existence should
> raise serious concerns about the integrity of the
> foreclosure process . . . .

Complete, true, and correct copies of "Written Testimony of Adam J. Levitin,

Associate Professor of Law, Georgetown University Law Center, Before the Senate

Committee on Banking, Housing, and Urban Affairs, 'Problems in Mortgage

Servicing from Modification to Foreclosure,' November 16, 2010, 2:30 p.m." and

"Written Testimony of Adam J. Levitin, Associate Professor of Law, Georgetown

University Law Center, Before the House Financial Services Committee, Sub-

Committee on Housing and Community Opportunity, 'Robo-Signing, Chain of

Title, Loss Mitigation, and other Issues in Mortgage Servicing,' 11/18/2010, 10:00

a.m." are attached hereto as Exhibit "M."

56.    In June of 2008, the Commonwealth of Massachusetts sued Defendant

Option One and other subprime lenders for unfair and discriminatory lending

practices.  Defendant Option One settled with the state in August of 2011, the

settlement will provide $125 million in loan modifications and restitution for

homeowners with loans originated by Option One between 2004 and 2008 and

thereafter serviced by American Home Mortgage Servicing, Inc.  Furthermore,

African American and Latino borrowers are entitled to a separate payment as a

result of excessive and discriminatory fees imposed upon minorities by Option One.  Mr. Pascua, himself a Latino borrower, took out a loan with Defendant Option One in July of 2007, which was subsequently serviced by American Home Mortgage Servicing.  Therefore, Mr. Pascua falls into the same category of borrower that the Commonwealth of Massachusetts sought to protect.  (A complete, true, and correct copy of the August 9, 2011, Press Release detailing the settlement is attached hereto as Exhibit "N."  A complete, true, and correct copy of the "Option One Settlement FAQs" is attached hereto as Exhibit "O.")

57.    On April 24, 2012, the U.S. Securities and Exchange Commission sued Option One for defrauding investors in subprime mortgage investments, using deceptive business practices.  This time Option One settled for the amount of $28.2 million.  Once again, Option One's deceptive business practices are at full display in the case at bar.  (A complete, true, and correct copy of the SEC Litigation Release No. 22344, published on April 24, 2012, is attached hereto as Exhibit "P.")

58.    On March 12, 2012, the Office of Inspector General of the Department of Housing and Urban Development issued a detailed "Memorandum of Review" of Defendant Wells Fargo's foreclosure practices.  This Memorandum concluded that Wells Fargo "failed to establish proper policies and procedures that fostered compliance with laws and regulations."  Wells Fargo's affiants often "robosigned foreclosure documents" without performing a due diligence review or

verification of the facts.  Additionally, the Memorandum found that Wells Fargo "[filed] improper legal documents."  (A complete, true, and correct copy of the Memorandum is attached hereto as Exhibit "Q.")

59.    On March 12, 2012, the State of Hawaii, by Attorney General David M. Louie, sued Defendant Wells Fargo, "alleging that Wells Fargo & Company and Wells Fargo Bank, N.A. . . . violated, among other laws, the Unfair and Deceptive Acts and Practices law of Hawaii, the False Claims Act, the Financial Institution Reform, Recovery, and Enforcement Act of 1989, the Servicemembers Civil Relief Act, and the Bankruptcy Code and Federal Rules of Bankruptcy Procedure." Wells Fargo agreed to pay $1,005,233,716 in fines and $1,489,813,925 in payments to foreclosed borrowers in response to Wells Fargo's widespread, fraudulent, and abusive foreclosure practices.  (The Complaint in *United States of America* et al. v. *Bank of America Corp*. et al., Case 12-cv-361, 12 March 2012, is attached hereto as Exhibit "R.")

**COUNT I:**
**VIOLATION OF UNITED STATES**
**FAIR DEBT COLLECTION PRACTICES ACT**

60.    Mr. Pascua hereby realleges and incorporates the facts as alleged in paragraphs 1-59.

61.    The actions of Defendants Homeward, Wells Fargo, and Ocwen violate (and will continue to violate) the United States' Fair Debt Collection

Practices Act, 15 U.S.C. §§ 1692 *et seq*., which provides in relevant part:

> §807.  A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt . . . .  [T]he following conduct is a violation of this section: . . .
>
> (2) The false representation of –
>> (A) the character, amount, or legal status of any debt; or . . .
>
> (4) The representation or implication that nonpayment of any debt will result in the . . . sale of any property . . . unless such action is lawful . . . ,
>
> (5) The threat to take any action that cannot legally be taken . . . .
>
> (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false . . . .
>
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt . . . .
>
> §808.   A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt . . . .  [T]he following conduct is a violation of this section:
>
> (1)  The collection of any amount . . . unless such amount is expressly authorized by the agreement creating the debt . . . .

62.    Within the last year, Defendant Homeward, either acting alone or in collusion with the other Defendants, acted as a debt collector, and not as a creditor, under the FDCPA because it used instrumentalities of interstate commerce or the

mails in a business the principal purpose of which is the collection of debts owed to another.

63.     Defendants are not the holders of Mr. Pascua Note or Mortgage, i.e. they are not the mortgagees.

64.     Defendants Homeward, Wells Fargo, and Ocwen have not loaned any money to Mr. Pascua with respect to the mortgage.

65.     However, Defendants Homeward, Wells Fargo, and Ocwen have sought (and Homeward has received) payments, which were actually "owed . . . to another."

66.     On February 8, 2013, Defendant Homeward sent Mr. Pascua a letter explicitly stating: "Homeward Residential, Inc. is a debt collector attempting to collect a debt.  Any information obtained will be used for that purpose."   (A complete, true, and correct copy of the Letter dated February 8, 2013, and stating that Homeward is a debt collector is attached hereto as Exhibit "S.")

67.     Within the last year, Defendants Homeward, Wells Fargo, and Ocwen knowingly and intentionally communicated, and continue to communicate, deceptive, false, fraudulent, and misleading statements to Mr. Pascua representing or implying that Defendants' were (and are) the holder of the Note and the Mortgage and the servicer of the loan.  (*See* Exhibits "F" through "L.")

68.     Defendant Wells Fargo sent communications to Mr. Pascua falsely

representing that Wells Fargo had standing and authority to foreclose the Mortgage. (*See* Exhibits "H," the Notice of Default.)

69.     Defendants Homeward, Wells Fargo, and Ocwen have used false, deceptive, and misleading representations to Mr. Pascua in connection with the collection of an alleged debt.

70.     Defendants Homeward, Wells Fargo, and Ocwen have falsely represented to Mr. Pascua the character, amount, and legal status of the alleged debt.

71.     Defendants Homeward, Wells Fargo, and Ocwen have falsely represented to Mr. Pascua that non-payment of the alleged debt will result in a sale of the Subject Property.

72.     Defendants Homeward, Wells Fargo, and Ocwen have communicated with third parties information about Mr. Pascua's credit, which information is known, or which should be known to be false.

73. Defendants Homeward, Wells Fargo, and Ocwen have used false representations, deception, and unconscionable means to collect or attempt to collect the alleged debt from Mr. Pascua.

74.     Defendants Homeward, Wells Fargo, and Ocwen have attempted to collect the alleged debt from Mr. Pascua in an amount not expressly authorized by the agreement creating the debt and not permitted by law.

75.   The actions of Defendants Homeward, Wells Fargo, and Ocwen  against Mr. Pascua have caused both general and special actual damages to Mr. Pascua, including but not limited to the following:

a.      reduction in market value of the property from $430,300 to       zero,

b.      paying out of pocket for uninsured damages,

c.      loss of reputation,

d.      increased cost of borrowing money,

e.      emotional harm, and

f.      other general and special actual damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order:

a.      Awarding Plaintiff statutory damages in the amount of $1,000 plus general and special actual damages in an amount to be determined at trial (estimated at $430,300);

b.      Awarding Plaintiff reasonable attorneys' fees and costs; and

c.      Granting any such other and further relief as it deems just       and proper.

## COUNT II:
## SLANDER OF TITLE

56.   Mr. Pascua hereby realleges and incorporates the facts as alleged in paragraphs 1-55.

57.   Defendant Option One prepared and had notarized a blank

Assignment of Mortgage.  Defendants prepared allonges with no legal effect for the purpose of manipulating their purported ownership of the Note.  These actions, and likely others that remain unknown to Mr. Pascua show that Defendants are attempting to make wrongful claims on the Subject Property.

58.     Upon information and belief, based on the pre-notarized Assignment, Defendant Option One sold its interest in the Subject Property immediately after Mr. Pascua signed his mortgage.  As such, Defendant Option One had no interest in the Subject Property, the Note, or the Mortgage when it recorded the Mortgage on the title to the Subject Property.   It therefore published a false document on the Subject Property's title.

59.     Defendant Option One acted with malice, as it published false statements in order to claim for itself an interest that it had sold to another entity.  In so doing, it preserved the false chain of title that each Defendant relies on in order to claim an interest in the Subject Property.

60.   The published mortgage is publicly available, as it is recorded with the Bureau of Conveyances for the State of Hawai'i.

61.     The published mortgage encumbers Mr. Pascua's property and therefore takes from Mr. Pascua an amount that would otherwise be his if the form of equity.

62.     Mr. Pascua has been harmed by the Mortgage being recorded as it is

because it has enabled each Defendant to allege their false interests in the Subject

Property.  Additionally, it has exposed him to double liability for the Mortgage.

WHEREFORE, the Petitioner respectfully prays for relief as follows:

a.      Actual Damages of $430,000.00;

b.      Awarding Petitioner the costs of bringing this action;

c.      Awarding Petitioner reasonable attorneys' fees for bringing this

action; and

d.      Granting any further relief that this Court deems just and

proper.

**COUNT III:**
**QUIET TITLE**

63.     Mr. Pascua hereby repeats, realleges and incorporates the facts as

alleged in paragraphs 1-81.

64.     There is a judiciable controversy as to what are the rights of the

competing claimants to adverse interests, all claiming to be mortgagees of the

Subject Property.  The fact that there are competing claims constitutes a cloud on

title.

65.     Defendants all are joined because they all claim adversely to Mr.

Pascua, an estate or interest in real property, that is, the Note and the Mortgage.

Option One is named because it is the only mortgagee to appear on title although,

upon information and belief, it has no interest in the Subject Property.

66.     A judgment declaring the rights of the parties in the case at bar would settle the controversy between the parties.

67.     A judgment declaring the rights of the parties is the most efficient way to clarify the legal relations between the parties.

68.     There is no adequate remedy at law to resolve this case and controversy.

69.     Mr. Pascua does not dispute that he owes a debt under the Note and Mortgage.  But Mr. Pascua is required by law to make payments only to the correct party.  Only with a declaratory judgment can Mr. Parton know to which party to make his future mortgage payments.  If the mortgagor makes payments to the wrong party, or if a servicer instead of a mortgagee forecloses, the mortgagor will be liable for double payments.

70.     Mr. Pascua has been harmed by the actions of the Defendants, and the harm will continue—absent a declaration by this Court of the parties' rights.

WHEREFORE, Plaintiff respectfully prays for relief as follows:

a.      For a judgment by this Court, pursuant to its powers under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring what is the interest (if any) of the Defendants and the Plaintiff in the Subject Property and in the Mortgage therein;

b.      Removing all clouds on the title of the Subject Property, resulting

from Defendants' actions;

c.      Awarding Plaintiff the costs of bringing this action;

d.      Awarding Plaintiff reasonable attorneys' fees for bringing this action;

and

e.      Granting any further relief that this Court deems just and

proper.

Dated: May 27, 2014,
      Honolulu, Hawaiʻi.        Respectfully Submitted,


       /s/ Robert Stone
      Attorney for Plaintiff

## **VERIFICATION**

I, Robert Stone, Att. No. 9920, do hereby verify that I personally assembled the exhibits to the complaint in the case at bar and that I know that all of them are complete, true , and correct.   Also, I have read all of the allegations in the Complaint, and, under penalty of perjury, I verify that all are true.

Dated: May 27, 2014,
            Honolulu, Hawaiʻi.            Respectfully Submitted,

                                       /s/ Robert Stone
                                 Attorney for Plaintiff

## **DEMAND FOR JURY TRIAL**

As to all claims in the above-captioned Complaint and where permitted by law or equity, Plaintiff demands a trial by jury.

                                 /s/ Robert Stone
                                  Robert Stone
                              Attorney for Plaintiff